IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 8, 2020

**BRANDON D. THEUS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Madison County**
**No.  C-18-278        Roy B. Morgan, Jr., Judge**
_____

**No. W2019-01120-CCA-R3-PC**
_____

The Petitioner, Brandon D. Theus, appeals the Madison County Circuit Court's denial of his petition for post-conviction relief from his 2016 conviction for unlawful possession of a firearm by a convicted felon.  The Petitioner contends that he received the ineffective assistance of counsel.  We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

J. Colin Morris, Jackson, Tennessee, for the appellant, Brandon D. Theus.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Jody Pickens, District Attorney General; and Al Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Petitioner's firearm conviction resulted from a traffic stop during which police officers observed a firearm inside the Petitioner's truck.  This court affirmed the conviction and summarized the facts of the case as follows:

. . . [O]n May 19, 2015, between 11:30 p.m. and midnight, Investigator Robert Groves with the patrol division of the Jackson Police Department received a be-on-the-lookout alert (BOLO) from the dispatcher regarding a vehicle which was suspected to have been involved in a robbery and which was traveling down East Chester Street into the city from the Beech Bluff area.  The vehicle was described as a white Chevrolet

Silverado pickup truck that was occupied by an African-American man and a Caucasian man.

Investigator Groves turned onto East Chester Street and saw a white Chevrolet Silverado pickup truck, which appeared to be occupied by an African-American male, in the parking lot of an Exxon. Investigator Groves reported over the police radio that he observed a vehicle matching the description of the vehicle reported in the BOLO alert and that he planned to attempt to stop the vehicle. Investigator Groves allowed the truck to drive out of the parking lot and then stopped the truck in the area of Griffin Street and East Chester Street.

Officer Kyle Hamilton and another officer joined Investigator Groves at the stop. Investigator Groves approached the driver's side of the truck, while Officer Hamilton and the other officer approached the passenger's side. The driver of the truck was identified as the Defendant. Investigator Groves informed the Defendant that he had been alerted to an incident outside of the city that involved a truck matching the description of the truck that the Defendant was driving. As Investigator Groves was speaking to the Defendant, Officer Hamilton signaled to Investigator Groves that he saw a weapon in the truck. Investigator Groves asked the Defendant to step out of the truck in order to distance the Defendant from the weapon.

Investigator Groves testified that the Defendant initially refused to comply with his instruction to exit the truck. The Defendant stated that he was not going to exit the truck, asked why he needed to exit the truck, and stated that his grandfather lived down the street. The Defendant eventually exited the truck after Investigator Groves opened the door.

Investigator Groves stated that the officers did not mention to the Defendant that they saw a weapon inside of the truck. When one of the officers told the Defendant that the officer was going to pat the Defendant down for weapons, the Defendant stated that the truck belonged to his grandfather and that his grandfather had a gun inside the truck. Investigator Groves informed the Defendant that the officers had to determine whether the Defendant was allowed to possess a gun and whether the gun was stolen. The Defendant told Investigator Groves that the gun was not stolen and asked to call his grandfather.

Investigator Groves ran the Defendant's information through the National Crime Information Center (NCIC) and learned that the Defendant

had two prior felony convictions. He subsequently arrested the Defendant and placed him in the backseat of the patrol car. While the Defendant was in the backseat of the patrol car and the officers were outside, the Defendant retrieved his cellular phone and made multiple calls. Investigator Groves testified that during one conversation, a man asked whether the Defendant's fingerprints would be on the gun, and the Defendant replied that they should not be on the gun. The video of the stop from the dash camera and the backseat camera of Investigator Groves's patrol car were played for the jury. The man whom the Defendant called was later identified as the Defendant's grandfather, and the Defendant told his grandfather that a friend placed the gun in the truck. During a call to a woman who was later identified as the Defendant's girlfriend, the Defendant informed her that he had been arrested due to "the gun."

The officers recovered a Hi-Point handgun with a magazine loaded with ten .40 caliber rounds from the truck. Investigator Groves stated that the gun was lying on the floorboard with the grip of the gun facing the driver.

On cross-examination, Investigator Groves testified that the Defendant was not involved in the robbery in the Beech Bluff area. The owner of the truck was Mr. Leroy Theus, who lived on Griffin Street, the area in which Investigator Groves stopped the truck. At one point during the stop, Investigator Groves told the Defendant, "You're good," but he did not know why he made the statement.

Investigator Groves testified that the gun was located on the back floorboard with a portion of the gun "barely" underneath the seat. He acknowledged that he believed that the gun was physically placed within arm's reach of the driver.

On redirect examination, Investigator Groves testified that he had to make a "U-turn" in order to initiate the stop. He said that as a result, the Defendant had ample time to discard the gun or place it anywhere inside the truck.

Mr. Leroy Theus, the Defendant's grandfather, testified that he lived on Griffin Street and owned a white Chevrolet Silverado pickup truck. Mr. Theus denied that the gun found in the truck belonged to him and said he did not know who owned the gun.

Officer Amiee Oxley, the director of the property and evidence unit of the Jackson Police Department, was unable to find any identifiable fingerprints on the gun. She explained that according to the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the likelihood of locating fingerprints on a firearm is approximately ten percent because firearms generally have few smooth surfaces. Officer Oxley stated that based on her experience, the likelihood is approximately five percent. Officer Oxley did not attempt to obtain fingerprints from the rounds in the magazine.

Officers traced the gun seized from the truck to Ms. Briyana Gray. Ms. Gray purchased the gun through a website in 2014; the gun was transferred to Range USA in Jackson; and Range USA transferred the gun to Ms. Gray in November 2014. Ms. Gray testified that she kept the gun for six or eight months and then sold it to her cousin, Rondrez Billings, because her mother did not want it in her house. Ms. Gray did not know what happened to the gun after she sold it.

On cross-examination, Ms. Gray testified that she received a subpoena to testify a few months before trial. She said she did not have any issues coming to court to testify. She did not know the Defendant and had not seen him or spoken to him previously.

The State introduced a recording of telephone calls made by the Defendant from the jail two days prior to trial. During one of the calls, the Defendant instructed his girlfriend to tell Mr. Billings and Ms. Gray not to attend the trial and told his girlfriend to inform Mr. Billings that the Defendant knew where he lived and was "serious as a heart attack."

Investigator Ashley Robertson with the Jackson Police Department testified that after officers initially interviewed Ms. Gray, they attempted to locate Mr. Billings but were unsuccessful. A subpoena was issued for Mr. Billings on March 16, 2016, to testify during the May 2016 trial but was returned on March 18 as undeliverable because the apartment listed on the subpoena was vacant.

The State introduced a certified judgment showing that on February 12, 2001, the Defendant pled guilty to facilitation of first degree murder and received a fifteen-year sentence.

The Defendant testified that he was with Mr. Billings prior to the stop. He said they had just left work for the day and stopped by his

grandfather's house to borrow his truck so that they could go to the convenience store to purchase cigarettes. The Defendant stated that as they were driving into the parking lot, he saw six cars from the sheriff's office driving down East Chester Street. He saw two patrol cars driving up and down the street as he entered the convenience store. He said that when he returned to the truck, Mr. Billings was gone.

The Defendant testified that he was driving to his grandfather's house to return the truck when he was stopped by the police. The Defendant stated that after the officer approached the truck, the officer told him that he "was good," which meant that he was allowed to leave. The officer then instructed him to step outside of the truck. The Defendant told the officer that he did not do anything wrong, that he could produce a valid driver's license and the truck's registration, and that the truck belonged to his grandfather, who could give the officers permission to search the truck.

The Defendant maintained that the video recording of the stop was not accurate because it did not depict the second officer assuming control of the situation and the second officer's statements could not be heard in the recording. According to the Defendant, the second officer instructed him to exit the truck and that when the Defendant asked why, the second officer replied, "It's a gun right there." The Defendant testified that he did not know that a gun was inside the truck and did not learn about the gun until the officers informed him of it. The Defendant stated that the gun was on the floorboard behind the passenger's seat and tucked a bit underneath the seat. He explained that he believed that the gun had to belong to his grandfather because the gun was in his grandfather's truck. The Defendant stated that after he received discovery from the State, he saw Mr. Billings's name on the witness list and Ms. Gray's statement to the police that she sold the gun to Mr. Billings. The Defendant explained that after reviewing this information, he believed that Mr. Billings placed the gun inside the truck and then fled.

The Defendant also maintained that the recording of his cellular phone conversations while in the backseat of the patrol car was inaccurate. He stated that when his girlfriend asked him why he was going to jail, he did not say "the gun" but said "a gun."

On cross-examination, the Defendant testified that although he told his grandfather that a friend placed the gun inside the truck, he later said

-5-

that he did not know who placed the gun inside the truck. The Defendant explained that the friend to whom he was referring was Mr. Billings.

While acknowledging that he told his girlfriend to contact Mr. Billings and tell him to not attend the trial, the Defendant denied that he attempted to prevent witnesses from attending the trial and testifying. The Defendant also denied threatening Mr. Billings. The Defendant stated that although he believed that Mr. Billings would testify that the gun belonged to Mr. Billings, the Defendant told Mr. Billings to not attend trial because he believed that Investigator Robertson "probably had got to" Mr. Billings. The Defendant believed that Investigator Robertson threatened Mr. Billings and manipulated him into testifying for the State because Mr. Billings was a convicted felon. The Defendant said it was possible that Investigator Robertson also threatened Ms. Gray. On redirect examination, the Defendant testified that he did not believe that Mr. Billings would testify in his favor due to Mr. Billings's status as a convicted felon.

The jury convicted the Defendant of unlawful possession of a firearm after previously been convicted of a felony involving the attempted use of force, violence, or a deadly weapon, a Class C felony. *See* T.C.A. § 39-17-1307(b)(1)(A), (2). Following a sentencing hearing, the trial court sentenced the Defendant to nine years to be served in confinement as a Range II, multiple offender.

*State v. Brandon Dewayne Theus*, No. W2016-01625-CCA-R3-CD, 2017 WL 2872231, at *1-4 (Tenn. Crim. App. July 12, 2017), *perm. app. denied* (Tenn. Nov. 17, 2017).

On November 16, 2018, the Petitioner filed the instant petition for post-conviction relief, alleging multiple instances of ineffective assistance of counsel. The Petitioner filed multiple amended petitions. On appeal, however, his sole allegation of ineffective assistance is that trial counsel failed to present evidence at the suppression hearing to establish that the BOLO had been canceled before the traffic stop was initiated and that, as a result, the traffic stop was unlawful. Our recitation of the evidence at the post-conviction hearing is limited accordingly.

At the post-conviction hearing, trial counsel testified that he was appointed to represent the Petitioner in the trial court proceedings, that he obtained the State's discovery materials, and that he reviewed the materials with the Petitioner. Counsel stated that this case resulted from an unrelated robbery and shooting incident, which led to a police BOLO for a white Chevrolet Silverado truck. Counsel said that the Petitioner was driving a Chevrolet truck "not terribly far" from the scene of the shooting when the police initiated the traffic stop. Counsel recalled that the Petitioner had left a

convenience store after having finished working that night and that the Petitioner had not been at the scene of the shooting, which was about four and one-half miles from where the traffic stop occurred. Counsel said that the white Chevrolet Silverado was "similar" to the Petitioner's truck but that the Petitioner's truck was not the same truck involved in the shooting.

Trial counsel testified that he investigated the case, that he interviewed witnesses to the unrelated shooting, and that he filed a motion to suppress evidence on the basis that the stop was unlawful. When asked if he investigated when the BOLO was issued and canceled, counsel said that he reviewed records and a video recording and that he raised the issue of when the BOLO was canceled at the suppression hearing. Counsel said that, at the suppression hearing, he argued the reason for initiating the traffic stop had ended and that the police did not have reasonable suspicion to stop the Petitioner. Counsel said that the timing was "close" and that he thought the BOLO had been canceled before the police instructed the Petitioner to get out of the truck.

Trial counsel testified that the police cruiser video recording of the traffic stop showed "fairly quickly" that a firearm was behind the front passenger seat and that the officers used hand signals when the firearm was seen. Counsel stated that he argued at the suppression hearing that the BOLO had ended before the officers saw the firearm, although he could not recall at the post-conviction hearing if the BOLO had in fact been canceled before the officers saw the firearm.

Trial counsel testified that the Chevrolet Silverado that was the subject of the BOLO was involved in a police chase and that the truck wrecked during the pursuit. Counsel did not recall if he investigated when the wreck occurred in relation to when the BOLO was canceled. Counsel stated that although the Petitioner believed the video recording from the police cruiser had been altered, counsel did not find any evidence to support the allegation.

Trial counsel testified that, after the motion to suppress was denied, the State's strongest evidence that the Petitioner possessed the firearm was that the Petitioner was the only person inside the truck, although the truck belonged to the Petitioner's grandfather. Counsel agreed that he raised the suppression issue on appeal and that he argued the issue "with due diligence to the best of [his] ability." Counsel could not think of anything additional he could have done at the suppression hearing to convince the trial court that the BOLO had been canceled before the firearm had been seen by the police officers.

On cross-examination, trial counsel testified that the prosecutor had an open-file discovery policy and that he received everything to which the defense was entitled.

Counsel said that the traffic stop was based upon reasonable suspicion, not probable cause, and that the relevant timeline of when the traffic stop was initiated, when the firearm was seen by the police officers, and when the BOLO was canceled involved a matter of seconds or minutes. He agreed that the timeline was addressed at the motion to suppress hearing and on appeal. He did not dispute that Investigators Robertson and Groves prepared an "outline of the time" for the suppression hearing.

Trial counsel agreed that the proof at the trial was that the time reflected in the 9-1-1 call and the police officers' watches might not have been the same unless the clocks were synchronized. He agreed that a discrepancy between multiple persons' timelines could exist without "any kind of collusion" and that testimony at the suppression hearing and at the trial reflected "there is no synchronization." Counsel agreed that the police officers testified that they did not receive notice that the BOLO had been canceled until after the traffic stop was initiated. Counsel agreed that if this were true, the police conducted a lawful traffic stop. Counsel agreed that a person who denied ownership in a vehicle or an area to be searched lacked standing to challenge the search.

Trial counsel testified that the 9-1-1 audio recording and the police cruiser video recording were played for the trial court at the suppression hearing, that he argued the facts to the trial court, that the court denied the motion to suppress, and that the jury heard all of the evidence at the trial. Counsel agreed the police cruiser video recording reflected that the police officers had already initiated the traffic stop and had made "whatever gestures" regarding the firearm when the radio transmission canceling the BOLO occurred.

The Petitioner testified that he reviewed the police cruiser video recording about one month before the suppression hearing. Although he said that the prosecutor obtained the 9-1-1 audio recording on the day of the suppression hearing, the Petitioner stated that he did not hear the recording until he went to prison. The Petitioner later said that heard the recording at the suppression hearing. The Petitioner said that the 9-1-1 call did not reflect the time. He disagreed with the timeline that Investigator Robertson presented at the suppression hearing because trial counsel received a letter from the prosecutor stating that "information of communication event report from sheriff's department . . . doesn't match with the timeline that [Investigator] Robertson presented."

The Petitioner testified that, before the traffic stop, he had been at a convenience store purchasing cigarettes and that he had seen about six or seven police cruisers drive past the store at an accelerated speed. He said that the location of the shooting was nearby, that he saw a police cruiser parked across the street from the store, and that it was as though the officers were waiting for him to leave. He said that, in his opinion, the shooting suspects were in police custody when the police officers "turned on the blue

lights" based upon the Madison County Sheriff's Department "event report." He said the report showed that the 9-1-1 call was placed at 11:36:53, that it took 5 minutes and 51 seconds for the dispatcher to "route the call," and that he was detained 5 minutes and 56 second later. He said the report showed that Investigator Groves approached his truck at 11:49 p.m. and that the shooting suspects were detained at 11:47 p.m. The Petitioner said that at the time the police initiated the traffic stop, the police had "already cleared . . . the [shooting] scene." The Petitioner said that, as a result, the BOLO had been canceled four minutes before the officers approached his truck. The Petitioner said that he provided this information to trial counsel on the day of the suppression hearing but that counsel did not question the officers about it.

The Petitioner testified that he had never been provided documentation showing the exact time the BOLO was canceled and that the only relevant evidence came from the testifying police officers. The Petitioner said that Sergeant Brandon testified that the BOLO was canceled at 11:49 p.m. but that the dispatch log presented by Investigator Robertson showed that Investigator Groves initiated the traffic stop at 11:50:08 p.m. The Petitioner said that he and trial counsel did not discuss this information.

The Petitioner testified that the 9-1-1 audio recording did not reflect that the shooting victim provided a vehicle description of a white Chevrolet truck to the police dispatcher. The Petitioner questioned the origin of the description of the truck.

The Madison County Sheriff's Office communication report was received as an exhibit. The report reflected that the 9-1-1 call was received at 11:36:53 p.m. and that the first officer arrived on the scene at 11:47:50 p.m.

On cross-examination, the Petitioner agreed that the police officers testified at the suppression hearing that they were outside the police cruiser and had already initiated the traffic stop when the BOLO was canceled. The Petitioner said, though, that Investigator Groves testified at the preliminary hearing that he "never knew" it had been canceled and that Investigator Groves's testimony changed at the suppression hearing. The Petitioner said that Investigator Groves testified at the suppression hearing that he "heard it." The Petitioner likewise said that the 9-1-1 caller testified that he did not provide a vehicle description during the call. The Petitioner said that the motion to suppress occurred on April 18 and that the trial occurred on May 3.

The post-conviction court determined that the trial court heard the Petitioner's motion to suppress before the trial. The court recalled the exhibits and sworn testimony of the law enforcement officers who testified at the suppression hearing. The court determined that the exhibits reflected a list of telephone calls with dates and times from the night of the offense and a disc containing six telephone calls between the "city and

county." The court found that at the suppression hearing, Investigator Groves testified that he received a description of the truck, that he saw the truck parked at a convenience store, that a traffic stop was initiated, and that a firearm was seen inside the truck being driven by the Petitioner. The court determined that Investigator Groves also testified that he saw the firearm when the Petitioner left the truck and that this occurred before the BOLO was canceled. The court noted Investigator Groves conceded that the time reflected in the police cruiser video recording could have been "a little off" and that the State noted that "there's not exact accuracy on watch matching." The court found that Sergeant Brandon testified at the suppression hearing that the BOLO was canceled at 11:49:57 p.m., which the court stated was consistent with the Petitioner's post-conviction hearing testimony.

The post-conviction court determined that Investigator Groves's suppression hearing testimony that the traffic stop was initiated and the firearm was seen before the BOLO was canceled was credited by the trial court. The post-conviction court determined that the traffic stop was based upon reasonable suspicion and that twelve seconds was the only issue. The court determined that the evidence at the suppression hearing showed that the BOLO was not canceled before the traffic stop was initiated and that the appellate court affirmed the trial court's determinations. The court noted that the Petitioner testified at the trial, that the jury evaluated the Petitioner's "position in the case" that he did not know about the firearm until the police officers saw it, and that the jury discredited the Petitioner's testimony. The court determined that trial counsel did not provide deficient performance resulting in prejudice to the Petitioner.

Additionally, the post-conviction court's written order denying relief reflects that the court determined that the timeline involving the 9-1-1 call, the issuance of the BOLO, the officers' initiating the traffic stop and observing the firearm, and the cancellation of the BOLO were presented during the suppression hearing and considered by the trial court. The post-conviction court determined that the officers testified that they had already initiated the stop and had observed the firearm before the BOLO was canceled, that the clocks on the video recording and the 9-1-1 audio recording were not synchronized, and that discrepancies between the reports were result of the lack of synchronization. The post-conviction court determined that the trial court credited the testimony that the officers were not informed that the BOLO had been canceled until the traffic stop was completed. The court determined that the Petitioner failed to present sufficient evidence to "justify changing" the trial court's ruling on the motion to suppress. The post-conviction court determined that trial counsel litigated the timing issue at the suppression hearing and that the Petitioner had failed to show counsel provided ineffective assistance of counsel. This appeal followed.

The Petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to show at the suppression hearing that the BOLO had been canceled before the traffic stop was initiated by the police. The State responds that post-conviction court did not err by denying relief. We agree with the State.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993); *Hill v. Lockhart*, 474 U.S. 52 (1985). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the deficient performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that

"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The record reflects that the post-conviction court credited trial counsel's testimony. Counsel said that he sought to suppress the firearm found during the traffic stop on the basis that the police officers did not have reasonable suspicion to support the stop. The critical issue in this case was whether the BOLO had been canceled before the officers initiated the traffic stop and observed the firearm inside the truck. Counsel testified that the timing was close and that he argued at the suppression hearing that the BOLO had been canceled before the police requested the Petitioner to get out of the truck. Counsel reviewed the discovery materials, which included police records, the 9-1-1 audio recording, and a police cruiser video recording of the traffic stop. Counsel presented the records and the recordings to the trial court. Counsel said that the video recording showed "fairly quickly" the officers' using hand signals when the firearm, which was behind the front passenger seat, was observed. Counsel argued, though, that the BOLO had been canceled before the officers saw the firearm. Counsel stated that the relevant timeline of when the traffic stop was initiated, when the firearm was seen by police officers, and when the BOLO was canceled involved a matter of seconds or minutes. Counsel stated that although a discrepancy existed between the dispatch records and the video recording of the traffic stop, the police officers testified that the respective times were not synchronized and that the officers did not receive notice that the BOLO had been canceled until after the traffic stop occurred. Counsel agreed that the video recording reflected that the officers had already initiated the traffic stop and had made "whatever gestures" when the radio transmission canceling the BOLO occurred.

This court summarized the relevant evidence from the suppression hearing in the previous appeal. Investigator Groves testified that "by the time he was notified that the BOLO had been canceled, officers already had approached the truck, seen the gun, and were in the process of getting the [the Petitioner] out of the truck." *Brandon Dewayne Theus*, 2017 WL 2872231, at *4. Investigator Groves testified that

> according to the arrest warrant he prepared, the traffic stop occurred at approximately midnight. He noted that information in the arrest report listed the traffic stop as occurring at 11:51 p.m. and said that this time was possibly listed by the dispatcher.
>
> . . . [A]ccording to the video of the stop from the dash camera in his patrol car, he first saw the truck in the Exxon parking lot at 11:49:41 p.m. He pulled in behind the truck to make the stop at 11:50 p.m. He stated that

-12-

when he approached the Defendant on the driver's side, he had not learned that the BOLO had been canceled. Officer Hamilton signaled to Investigator Groves about seeing the gun in the truck at 11:51:11 p.m. Investigator Groves said he was not informed about the cancelation of the BOLO until after officers observed the gun in the truck.

. . . Investigator Groves testified that he had no way to compare the timing of the events discussed in the radio traffic to the time listed in the video of the stop . . . .

*Id*.

Investigator Robertson testified at the suppression hearing that the "central dispatch" records showed the following:

[T]he county dispatcher advised the city dispatcher of the BOLO at 11:43:43 p.m. The city dispatcher broadcast the BOLO [to] the officers from the Jackson Police Department at 11:45:04 p.m. At 11:49:30 p.m., Investigator Groves called central dispatch, reported seeing the truck leaving a gas station on East Chester Street, and stated that he would try to conduct a traffic stop. At 11:50:05 p.m., the county dispatcher called the city dispatcher to cancel the BOLO. While the county dispatcher was talking with the city dispatcher, Investigator Groves called at 11:50:08 p.m. and reported that he was stopping the truck. At 11:50:42 p.m., the city dispatcher broadcast over the radio to the city officers that the BOLO was canceled.

*Id*. at *5.

Investigator Robertson likewise testified at the suppression hearing that police cruiser "camera on Investigator Groves's patrol car was not synced with the times listed in the dispatcher's records. He stated that as a result, there could be a discrepancy of a few seconds to a few minutes or there could be no discrepancy." *Id*.

The trial court credited Investigator Groves's testimony that he had observed the firearm in plain view and had asked the Petitioner to get out of the truck "by the time" the BOLO was cancelled. *Id*.

We conclude that the record supports the post-conviction court's determination that the Petitioner did not receive the ineffective assistance of counsel. After reviewing the discovery materials, trial counsel sought to exclude the firearm as evidence on the basis that the officers did not have reasonable suspicion to initiate the traffic stop. Counsel litigated the issue of whether the BOLO had expired before the traffic stop was initiated and before the firearm was seen inside the truck. The discrepancy in the unsynchronized times reflected in the video recording and police records involved mere seconds, and the trial court credited the testimony of the investigating officers that the officers did not receive notice the BOLO had been canceled until after the traffic stop was initiated and the firearm was seen inside the truck. The Petitioner did not present any additional evidence at the post-conviction hearing to show that counsel provided deficient performance resulting in prejudice. The Petitioner is not entitled to relief on this basis.

Based upon the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE